# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 22-664V

| | |
|---|---|
| CHARLOTTE O'BRIEN,<br><br>        Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>        Respondent. | Chief Special Master Corcoran<br><br>Filed: June 1, 2026 |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Adam Nemeth Muffett, U.S. Department of Justice, Washington, DC, for Respondent.*

### DECISION AWARDING DAMAGES[1]

On June 15, 2022, Charlotte O'Brien filed a Petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered from a shoulder injury related to vaccine administration ("SIRVA") due to an influenza ("flu") vaccine administered on October 13, 2021. Petition at 1, ECF No. 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters, and although Respondent ultimately conceded entitlement, the parties could not informally resolve damages.

For the reasons set forth below, I find that Petitioner is entitled to compensation in the amount of **$135,000.00, for actual pain and suffering, plus $540.90 for past unreimbursed expenses, for a total of $135,540.90.**

---

[1] Because this unpublished Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

### I.    Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Special masters may consider prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in a specific case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may also rely on my own experience adjudicating similar claims.[3] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 579 (2013).

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussions in Section II of *Matthews v. Sec'y of*

---

[3] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases were assigned to former Chief Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

*Health & Hum. Servs.*, No. 22-1396V, 2025 WL 2606607, at *2-3 (Fed. Cl. Spec. Mstr. Aug. 13, 2025).

## II.    The Parties' Arguments

The parties agree Petitioner should be awarded $540.90 for past unreimbursed mileage expenses. *See* Br. at 1; *see also* Resp. at 2. Thus, the only area of disagreement is the amount of compensation which should be awarded for actual pain and suffering. Petitioner seeks $185,000.00 (Br. at 1), while Respondent proposes a lesser award of $90,000.00 (Resp. at 2).

In defense of her proposed sum, Petitioner describes her course of treatment, including her decision to seek treatment within approximately 46 days of vaccination because of her immediate and "rapidly" progressing symptoms. Br. at 9. She argues that despite undergoing formal treatment and engaging in a "diligent" and "committed" home exercise program following her March 2023 surgery, her treatment was "unsuccessful." *See id.* at 12; *see also* Reply at 6. She continues to suffer from "very significant" results of her SIRVA "to this day" (more than three years post vaccination at the time briefings were completed). Br. at 12. She emphasizes that her receipt of multiple steroid injections, participation in physical therapy ("PT"), and undergoing surgery were "unable to return her to the pain-free life she enjoyed prior to her vaccine-related injury." *See id.*

As a result, Petitioner now has difficulty performing activities of daily living ("ADLs"), including bathing, sleeping, cleaning, cooking, gardening, and she is faced with knowing she may never return to her baseline status because at her age, no doctor will approve a second surgery to remediate her ongoing symptoms. *See* Br. at 12-13; *see also* Reply at 7; Ex. 9. Thus, Petitioner favorably compares the duration and severity of her medical treatment with what was experienced by the petitioner in *Hooper v. Sec'y of Health & Hum. Servs.*, No. 17-12V, 2019 WL 2442880 (Fed. Cl. Apr. 3, 2019), a case featuring a past pain and suffering award of $185,000.00. Br. at 13. She insists that her injury and treatment course warrant an equivalent award in past pain and suffering than the petitioner in her cited case. *See id*.

Respondent, by contrast, emphasizes evidence showing Petitioner had an injury that was "mild." Resp. at 21. According to Respondent, Petitioner delayed care for 44 days post vaccination; she had at least two significant treatment gaps (six and seven months, respectively); she only returned to care to receive additional treatment when Respondent submitted his position and intention to engage in damages discussions; and there is evidence of a SLAP tear in this case, which cannot have been vaccine-caused. *Id.* at 8. Respondent thus argues the evidence supports a limited duration of Petitioner's vaccine-injury. *Id.* As guidance, Respondent cites other decisions featuring pain and

suffering awards ranging from $95,000.00 to $110,000.00, respectively – *Gray, Hunt,* and *Sprigg.*[4] *Id.* at 18-21.

Petitioner replies and maintains that her dominant arm injury is ongoing to this day, making her personal circumstances "much more severe" than the petitioners in the cases Respondent relies upon for support. Reply at 8. She also notes that while there were "a few brief periods" when she did not receive treatment for her shoulder injury, these gaps are easily explained by her receipt of steroid injections and do not evince recovery. *Id.* at 3. More so, Petitioner highlights that she consistently rated her pain high on a ten-point scale, including ratings of 8/10 through March 2024. *Id.* at 4-5. Petitioner argues there is insufficient evidence that Petitioner's SLAP tear was responsible for her ongoing symptoms. *Id.* at 3-4.

### III.    Appropriate Compensation for Petitioner's Past Pain and Suffering

In this case, awareness of the injury is not disputed. Petitioner was a competent adult with no impairments that would impact her consciousness of her injury. Therefore, I analyze principally the severity and duration of the injury. When performing this analysis, I review the record as a whole, including the medical records and declarations filed, and all assertions made by the parties in written documents.

The record shows that following her vaccination, Petitioner (age 71 at the time) suffered a moderately severe SIRVA causing her to report shoulder-related symptoms within approximately six weeks after vaccination, and to seek mostly consistent treatment for just under two years thereafter. She first sought care for left shoulder pain (with a visit to her primary care provider) on November 26, 2021, resulting in an assessment specific to the left shoulder, including bursitis, which the treater felt was possibly related to her flu vaccine. Ex. 2 at 191-92. Petitioner then received mostly steady treatment for her left shoulder until August 3, 2023 (thus for a total of 21 months and 21 days post vaccination) – but with some gaps in treatment. *See,* e.g., Ex. 13 at 19.

Respondent emphasizes evidence from the record suggesting that the treatment course contains multiple unexplained gaps, but I do not find this argument to be *fully* supported by the filed record. Rather, it appears (and Respondent seems to agree, Resp. at 15) that at least one of these gaps (from May 3 to September 27, 2022), can be explained by Petitioner's receipt of a steroid injection in May 2022. Ex. 8 at 6-8. In the

---

[4] *Gray v. Sec'y of Health & Hum. Servs.,* No. 20-1780V, 2022 WL 6957013 at *1 (Fed. Cl. Spec. Mstr. Sept. 12, 2022) (awarding $110,000.00 for past pain and suffering); *Hunt v. Sec'y of Health & Hum. Servs.,* No. 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022) (awarding $95,000.00 for past pain and suffering); and *Sprigg v. Sec'y of Health & Hum. Servs.,* No. 21-0523V, 2025 WL 1066421 (Fed. Cl. Spec. Mstr. Mar. 5, 2025) (awarding $110,000.00 for past pain and suffering).

Program, it is understood that steroid injections may provide temporary relief for a number of months following receipt, which often leads to a pause in treatment. *See, e.g.*, *Cross v. Sec'y of Health & Hum. Servs.*, No. 19-1958V, 2023 WL 120783, at *5 (Fed. Cl. Spec. Mstr. Jan. 6, 2023) (finding severity requirement met where the petitioner received a steroid injection and then did not seek care again for six months, stating that the "six-month gap in Petitioner's treatment for her shoulder is at least partially explained by the fact that she received a cortisone injection . . . which subsequently provided significant relief for a period of time"). This appears to have been (at least partially) the case here, with Petitioner reporting during her September 27, 2022 post-gap orthopedic follow-up visit that she "had a great response to the cortisone" but that "her symptoms of pain and stiffness started to recur mid[-]August" of 2022. Ex. 8 at 3. This evidence thus does not detract from a vaccine-related left shoulder injury that was ongoing during this first "gap" in treatment.

Likewise, there is then another nearly six-month gap following Petitioner's return to her orthopedist in September 2022. At the time of her September 27th visit, although Petitioner reported that her symptoms returned in August of that year after her steroid injection wore off, and her orthopedist recommended surgery at that time, Petitioner did not undergo this treatment until March 23, 2023 – approximately six months later, without any intervening left shoulder intervention. *See* Ex. 8 at 4; *see also* Ex. 11 at 5. This gap is more unexplained than Petitioner's gap following her receipt of another steroid injection, and thus serves as a mitigating factor in the determination of damages here, as it appears Petitioner was able to cope with her pain without treatment for a significant period of time despite the recommendation for aggressive treatment.

Thereafter, Petitioner underwent a left shoulder arthroscopy and manipulation surgery in March 2023 (that revealed mixed findings, some particular to a SIRVA and others less so, including post-operative diagnoses of left shoulder impingement syndrome, adhesive capsulitis, acromioclavicular and glenohumeral joint arthritis, and a left shoulder *labral tear*); she also received a steroid injection at the time of surgery. Ex. 11 at 5. Petitioner's post-operative treatment then extended consistently through early August of the same year. By her August 3, 2023 occupational therapy ("OT") follow-up visit, Petitioner was ultimately discharged to a home exercise program, "with full restoration of functional activity" and having "fully reached" her short term therapy goals. Ex. 13 at 19.

In light of this significant improvement in symptoms as noted by her treaters, the next gap in Petitioner's treatment for her left shoulder (from August 2023 to March 2024) is more problematic, and somewhat discredits her argument that her vaccine-injury continues to this day. Indeed, it was not until March 11, 2024 – over seven months since Petitioner's last OT visit with full functional capacity – that Petitioner returned to care for

her left shoulder. Ex. 16 at 25-28. At that time, she sought care with a *different* orthopedist (rather than return to the treater who performed her left shoulder surgery) and reported that she "[n]ever got better after surgery." *Id.* at 25. But this report is *wholly inconsistent* with the contemporaneous medical records from some of her post-operative orthopedic follow-up visits, during which she reported improvement after surgery and some additional rehabilitative treatment. *See,* e.g., Ex. 14 at 2-3 (a July 10, 2023 report that she felt "quite good and had quite good flexibility[;]" demonstration of full range of motion on examination; and a diagnosis of "[r]esolution of postoperative adhesive capsulitis[.]"); Ex. 13 at 19 (an August 3, 2023 documentation that she had satisfied short-term goals and experienced an overall improvement in symptoms sufficient for a discharge from care). While I acknowledge that Petitioner experienced *some* worsening following surgery, prompting her receipt of a repeat steroid injection in May 2023 (Ex. 14 at 8-10), the contemporaneous medical records otherwise show improvement and thus do not fully bolster her post-gap 2024 reports to treaters sufficient to support an ongoing injury at that later time.

In addition, while Petitioner's treater on March 11th suggested both surgical and non-surgical treatment options to address Petitioner's reports of left shoulder pain, Petitioner only attended one additional orthopedic follow-up thereafter (on April 8, 2024) – thus causing reason to doubt that her injury was ongoing at this time. Ex. 16 at 9, 12-13, 27 (reverse order). And this April 8th visit was following an MRI that revealed a SLAP tear (among other things)[5] – which was not seen in her earlier January 2022 MRI,[6] and is the kind of degenerative, comorbid shoulder issue not understood to be vaccine-caused. *See,* e.g., *Lang v. Sec'y of Health & Hum. Servs.,* No. 17-995V, 2020 WL 7873272, at *12-13 (Fed. Cl. Spec. Mstr. Dec. 11, 2020) (emphasizing that "findings consistent with impingement, rotator cuff tears, or [acromioclavicular] arthritis do not *per se* preclude a finding that a Table SIRVA exists," rather the question is whether the petitioner's "shoulder pathology wholly explain[ed] her symptoms independent of vaccination."); *Garcia v. Sec'y of Health & Hum. Servs.,* No. 19-1529V, 2025 WL 1159016, at *8, n. 15 (Fed. Cl. Spec. Mstr. Mar. 21, 2025) (emphasizing that even the petitioner's expert acknowledged that SLAP tear was "unrelated" to the compensable SIRVA); *Fortney v. Sec'y of Health & Hum. Servs.,* No. 20-1471V, 2025 WL 835601, at *8 - 9 (Fed. Cl. Spec. Mstr. Jan. 29, 2025) (reflecting Respondent's objection, and my own doubt, that a SLAP tear was consistent with SIRVA); *Lawson v. Sec'y of Health & Hum. Servs.,* No. 18-0882V, 2021 WL 688560, at *6 (Fed. Cl. Spec. Mstr. Jan. 5, 2021)

---

[5] Petitioner's April 8, 2024 MRI revealed a nondisplaced SLAP tear, mild supraspinatus tendinopathy along the bursal margin, trace subacromial-subdeltoid bursal fluid, and grade 2 glenohumeral chondromalacia (degeneration). Ex. 16 at 13.

[6] Petitioner's January 20, 2022 MRI revealed a low-grade interstitial tear of the supraspinatus tendon with moderated tendinosis and bursal surface fraying, mild subscapularis tendinosis, mild acromioclavicular joint degenerative changes, and a small subacromial bursitis. Ex. 4 at 12-13.

(similar). Notably, Petitioner's treater went so far as to opine that "the majority of [Petitioner's] symptoms [were] related to [her] rotator cuff bicep tendon/SLAP tear." Ex. 16 at 13. It is thus unlikely that Petitioner's later reports of ongoing symptoms in 2024 and beyond were related to her original vaccine-related injury, but rather were the result of her concurrent SLAP tear.[7]

I also note that Petitioner's decision to return to care following this seven-month gap came well after the filing of the instant claim (with the Petition having been filed in June 2022), and also shortly after Respondent had filed his Rule 4(c) Report (conceding Petitioner entitled to compensation in this matter and inviting discussions regarding damages).[8] *See,* e.g., Pet., ECF No. 1; ECF Nos. 25-27 (Respondent's Report and Ruling on Entitlement, issued on February 23, 2024). I thus give Petitioner's 2024 reports to treaters less weight in resolving the issue of duration. Consequently, Petitioner's assertions that her injury has persisted through the filing of her brief on damages (to 2025 and beyond) is lacking record support. It appears more likely than not that Petitioner's injury was mostly resolved by August 2023, with some lingering effects thereafter that merited only conservative treatment.

During her near 22-month course, Petitioner's treatment for her SIRVA was fairly aggressive overall and included surgery. Particularly relevant is her treatment with a total of three steroid injections, x-rays, MRIs, eight pre-operative PT sessions, 15 post-operative OT sessions, and a discharge to a home exercise plan after August 2023. Additionally, Petitioner's medical records contain descriptions of her pain on a ten-point scale that stand as evidence of more severity (in terms of damages). For instance, during her initial PT evaluation on December 15, 2021 (thus just over two months post vaccination), she described her pain as an 8/10. Ex. 3 at 5. She also maintained this level

---

[7] I am likewise not persuaded by Petitioner's argument that her treater on April 8, 2024, told her that her condition was expected to worsen and thus she can demonstrate an ongoing vaccine-related injury. *See,* e.g., Br. at 13. The bulk of the evidence negates this point, as Petitioner did not return to any treatment thereafter (surgical or otherwise) and by the time she sought care with this treater (seven months after receiving any left shoulder treatment), she was suffering from degenerative changes and tearing – thus likely responsible for any worsening or ongoing symptoms.

[8] The Program has often afforded statements made in pursuit of litigation less weight. Special masters have often afforded less weight to statements made to treating physicians when made in the context of litigation, or those made after a petitioner began to suspect she might have a Program claim. *See,* e.g., *Rastetter v. Sec'y of Health & Hum. Servs.,* No. 19-1840V, 2023 WL 5552317, at *10 (Fed. Cl. Spec. Mstr. Aug. 3, 2023) (affording little weight to a statement made after a 17-month gap in treatment, where the petitioner told the treater the return to care was at the direction of the lawyer); *Duda v. Sec'y of Health & Hum. Servs.,* No. 19-31V, 2021 WL 4735857, at *8 (Fed. Cl. Spec. Mstr. Aug. 10, 2021) (affording less weight to later statements made for the purposes of litigation that directly conflicted with earlier reports to treaters). While this does not mean that *every* petitioner who knows of the Program's existence or has a potential vaccine claim is inherently not credible, the specific factual circumstances of each case must be considered. *See Buck v. Sec'y of Health & Hum. Servs.,* No. 19-1301V, 2023 WL 6213423, at *8 (Fed. Cl. Spec. Mstr. Aug. 23, 2023).

of pain by the time she was discharged from PT in April 2022. *Id.* at 14. However, it appears that Petitioner experienced improvement in her symptoms following surgery, because she rated her pain post-surgery at a 3-4/10. Ex. 13 at 9. More evidence of a moderately severe injury comes from medical records showing minor range of motion limitations, only. *See,* e.g., Ex. 3 at 14-16.

Petitioner's offered comparable case of *Hooper* is mostly unhelpful in calculating pain and suffering, as it involves an injury that exceeded hers in terms of severity and duration. *See* 2019 WL 2442880. This case was decided by another special master – a preliminary factor that does not deprive it of relevance or applicability, but lends it less utility as a comparable matter than the hundreds of decisions rendered in SPU SIRVA claims over the past five years. More importantly, the *Hooper* petitioner sought care sooner than Ms. O'Brien here (just *two days* versus Petitioner's 44), and the *Hooper* petitioner rated his pain at a 9-10/10 within the first month after vaccination – thus evincing a more severe injury. *See* 2019 WL 2442880. The *Hooper* petitioner also treated for nearly 30 months without gaps in care (as seen in the instant case) and underwent *considerably* more PT than Ms. O'Brien (*65* versus 23 sessions). *See id.* Lastly, the *Hooper* petitioner opted to undergo surgery within seven months of the onset of his shoulder injury (versus Petitioner's 17-month delay), and the *Hooper* petitioner experienced a notable 50% permanent disability – not sufficiently supported here. I thus find an award lower than $185,000.00 to be appropriate in this case.[9]

The cases cited by Respondent provide more useful comparisons and thus serve as helpful indicators for what award would best comport with Ms. O'Brien's circumstances. Nonetheless, Petitioner deserves more than the $95,000.00-$110,000.00[10] awarded in Respondent's cited cases.

Respondent's offered comparable case of *Hunt*, for example, is largely unhelpful in calculating pain and suffering. *Hunt v. Sec'y of Health & Hum. Servs.,* No. 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022). As has previously been noted, this decision stands as an "outlier determination[], and rare instance[] of deviating from the above $100,000.00 'norm' for SIRVA cases involving surgery." *Laurette v. Sec'y of Health & Hum. Servs.*, No. 19-1047V, 2024 WL 1741611, at *5 (Fed. Cl. Spec. Mstr. Mar. 25, 2024); *see also,* e.g., *Olson v. Sec'y of Health & Hum. Servs.*, No. 21-0408V, 2024 WL 1521634, at *4 (Fed. Cl. Spec. Mstr. Mar. 4, 2024); *Gao v. Sec'y of Health & Hum. Servs.*, No. 21-1884V, 2023 WL 6182455, at *3 (Fed. Cl. Spec. Mstr. Aug. 18, 2023)

---

[9] I will also note that in cases involving awards of Petitioner's requested amount of $185,000.00, the relevant petitioners typically undergo more than one surgical procedure. *See,* e.g., *Tappendorf v. Sec'y of Health & Hum. Servs.,* No. 20-1592V, 2024 WL 1299566 (Fed. Cl. Spec. Mstr. Feb. 23, 2024).

[10] Interestingly, the pain and suffering awards in the cases relied upon by Respondent exceed Respondent's proposed award of $90,000.00.

(emphasizing that *Hunt* was a "*sui generis* instance[] of a sub-six figure award in SIRVA cases featuring surgery"). It is instead the case that "the policy goals of the Vaccine Program are best served if outcomes in common cases (like SIRVA vaccine injury claims) are predictable and/or subject to some uniformity – and it has been my determination that surgery cases reasonably present a degree of suffering justifying a six-figure award. (Otherwise, adjustments are always considered and made to account for the facts of each case, and in some instances even SIRVA surgery cases result in lower pain and suffering awards)." *Richardson v. Sec'y of Health & Hum. Servs.*, No. 20-0674V, 2023 WL 6180813, at *8 (Fed. Cl. Spec. Mstr. Aug. 16, 2023). Petitioner's SIRVA was not so exceptionally moderate to warrant a departure below the six-figure norm for injuries leading to surgery (and certainly not even lower such that it might fit Respondent's proposal of $90,000.00).

Additionally, the remaining cases on which Respondent relies for support (*Gray* and *Sprigg*), do not provide sufficiently adequate comparisons to the facts of Petitioner's case. *Gray v. Sec'y of Health & Hum. Servs.,* No. 20-1780V, 2022 WL 6957013 at *1 (Fed. Cl. Spec. Mstr. Sept. 12, 2022); *Sprigg v. Sec'y of Health & Hum. Servs.,* No. 21-0523V, 2025 WL 1066421 (Fed. Cl. Spec. Mstr. Mar. 5, 2025). For instance, the *Gray* petitioner was considered to be mostly recovered within one year of vaccination, albeit without experiencing any gaps in shoulder-related treatment; Petitioner here treated for nearly 22 months following the onset of her left shoulder injury, with some mostly explained gaps. *See* 2022 WL 6957013. Supplemental evidence for a mild injury in *Gray* includes the fact that *Gray* did not receive any cortisone injections and the findings on MRI included tendinitis and bursitis, only. *See id.*

Likewise, the petitioner in *Sprigg* experienced an injury that mostly resolved by eight months post vaccination (with some ongoing, unrelated pain thereafter). *See* 2025 WL 1066421. And the *Sprigg* petitioner underwent less care than Ms. O'Brien, including one steroid injection and 15 PT sessions (compared to Petitioner's three injections and 23 sessions of PT/OT). *See id.* While the *Sprigg* petitioner thus had a mild surgical injury overall, *Sprigg* was awarded slightly more in pain and suffering than she typically would have been as a result of the compelling hardship imposed on her personal circumstances caused by her shoulder symptoms. *Id.* Indeed, the *Sprigg* petitioner was a caretaker for elderly family members that lived in her home and thus experienced difficulties caring for them as a result of her injury. *Id.*

Although I credit Ms. O'Brien's assertions that she also has experienced some ongoing difficulties with common ADLs (i.e., sleeping, gardening) as a result of her injury *in her dominant arm*, she has not established any other unique personal circumstances as seen in *Sprigg*, for example, sufficient to justify a higher pain and suffering award for an otherwise moderately severe surgical SIRVA that mostly resolved. Nevertheless, an

award of $110,000.00 would be too low given the facts.

**Taking all of the foregoing into consideration, I find that $135,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**

## CONCLUSION

In light of all of the above, I award **Petitioner a lump sum payment of $135,540.90**, **(representing compensation for actual pain and suffering and past unreimbursed expenses) to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[11]

**IT IS SO ORDERED.**

> **s/Brian H. Corcoran**
> Brian H. Corcoran
> Chief Special Master

---

[11] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.